IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PATRICIA RASH,<br><br>                Plaintiff,<br><br>        vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>                Defendant. | CASE NO. 5:22-cv-01053<br><br>DISTRICT JUDGE<br>Bridget Meehan Brennan<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Patricia Rash filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying her supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In September 2019, Rash filed an application for supplemental security income, alleging a disability onset date of September 1, 2019,[1] and claiming that she was disabled due to post-traumatic stress disorder and anxiety. Tr.

---

[1] "Once a finding of disability is made, the [Social Security Administration] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

132–33, 156. The Commissioner denied Rash's applications at the initial level and upon reconsideration. Tr. 132–50, 153–56, 160–61. Rash requested a hearing before an administrative law judge (ALJ). Tr. 162–64

In December 2020, an ALJ held a hearing at which Rash and vocational expert Mary Everts testified. Tr. 103–31. In February 2021, the ALJ issued a written decision finding that Rash was not disabled. Tr. 87–96. The ALJ's decision became final in April 2022, when the Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981. Rash filed this action in June 2022. Doc. 1. She asserts the following assignment of error:

> The Administrative Law Judge found that Plaintiff retained the residual functional capacity for unskilled, low-stress work. This finding lacks the support of substantial evidence because the ALJ erred in his analysis of Plaintiff's mental impairments.

Doc. 7, at 1.

### Factual background

*Personal and vocational evidence*

Rash was born in 1992 and was 27 years old on the onset date of her alleged disability. Tr. 132–33. She dropped out of school in the ninth grade. Tr. 110, 134. It is undisputed that Rash has no past relevant work experience. *See* Tr. 95, 140.

*Medical evidence*

Although Rash's medical evidence spans hundreds of pages, Tr. 757–91, 875–77, 1057–58, 1091– 94, 1114–1243, 1291–1326, 1433–35, 1446–1609,

2

1647–1825, Rash presents a narrow issue. It is thus unnecessary to fully recite the record evidence.

The record details in excess of 40 encounters for Rash with medical professionals from 2018 through 2020. While some of Rash's encounters with medical professionals involved visits to a hospital emergency room, *e.g.* 1147–59, the encounters at the heart of Rash's case concern her visits to Phoenix Rising Behavioral Healthcare and Recovery, Inc, *see* Doc. 7, at 11. In particular, Rash focuses on her visits to Phoenix Rising between December 2019 and December 2020. *Id.* So I'll likewise focus on those visits, while discussing a few other visits for context.

In late September 2019, Rash presented herself for what appears to be her fourth visit in 2019 at Phoenix Rising. Tr. 1188–94; *see* Tr. 1195–1224. She reported to her care provider, advanced practice registered nurse Stephanie Martin, that she experienced daily mood swings, during which she went "from elevated happy to angry and yelling and sometimes sad." Tr. 1189. Rash said that she would become irritated and "'explode with yelling, throwing things at walls" and with anger while "hit[ting] [her] head against [a] wall." *Id.* These episodes also involved hypomania and her "clean[ing her] whole house [from] top to bottom." *Id.* Rash reported problems with nightmares since she was 17.

*Id.* She also experienced auditory and visual hallucinations, hearing frightening, deep-voiced men and seeing black shadows.[2] *Id*; *see* Tr. 1190.

Martin described Rash as "depressed[,] anxious[, and] irritable." Tr. 1190. Martin diagnosed Rash with generalized anxiety disorder, post-traumatic stress disorder, delusional disorders, a personal history of abuse in childhood, problems related to housing and economic circumstances, and chronic monopolar depression. Tr. 1192. Martin also "reconciled" Rash's six medications, including medications to help with her sleep, nightmares, and mood swings. Tr. 1193.

Rash returned to Phoenix Rising in early December 2019. Tr. 1492–95. Licensed professional counselor Shannon Baker observed positive "notable change" in respect to Rash's mood and thought process and negative "notable change" in respect to Rash's medical condition—she had abdominal pain "attribute[d] to menses." Tr. 1493. Baker observed no significant change in respect to motor activity and speech, behavior and functioning, and substance use and addictive behavior. *Id.*

Rash reported "experiencing anxiety 'out of no[]where' (panic) where her heart races, her chest hurts, and she feels hot." Tr. 1495. Rash said that although she was not experiencing many hallucinations, she "once felt like someone was in the shower with her." *Id.* She also reported that she thought

---

[2]    Rash's appointment is documented in a report that Martin prepared. Aside from the hypomania episodes, Rash's reported circumstances mirror what she'd previously reported. *See* Tr. 1465 (May 2019 meeting).

4

of cutting herself "during a low period of two consecutive days" during which "she didn't want to eat." *Id*. Rash was also "overc[o]me by thoughts of thinking of her daughter." *Id*.

Rash met with Counselor Baker by phone in mid-April 2020. Tr. 1548–51. Baker recounted Rash's previous diagnosis, and noted that Rash was "molested by" her grandfather at age 12 and that she grew up in family comprised "entirely of alcoholics."[3] Tr. 1540–41. Rash reported having run out of medication. Tr. 1541. Consistent with past reporting, Rash reported mood swings, irritability, yelling and exploding and throwing things, and episodes of hypomania punctuated with whole-house cleaning. *Id*. She also reported auditory and visual hallucinations similar to previous reports. *Id*.

Baker assessed Rash as "depressed, anxious[, and] irritable" and noted that Rash reported no delusions, had clear speech and a "racing" thought process, and had some paranoid preoccupations and ruminations. Tr. 1542. But Rash's cognition was within normal limits, she had partial insight into her condition, and her judgment was within normal limits. *Id*.  Baker noted that Rash was taking seven medications, including medicine to help her sleep and for nightmares and mood swings. Tr. 1544.

Rash met with Martin by phone in June 2020. Tr. 1602–09. Rash reported feeling fatigue and experiencing irregular heartbeats and headaches.

---

[3]      Rash had previously reported these facts. *See* Tr. 1472 (March 2019), 1483 (January 2019).

Tr. 1602. She had anxiety, depression, and insomnia. *Id*. Much of what Rash reported and Martin assessed coincided with previous reports and assessments.[4] Tr. 1603–04. Rash also reported having nightmares and within the past two weeks and that she started again experiencing disturbing hallucinations. Tr. 1604. According to Martin's report, the voices "always sa[id] something about kill."[5] *Id*. After Martin confronted her, however, Rash admitted that she had used methamphetamines. Tr. 1603.

In early July 2020, Rash met by phone with Baker. Tr. 1597–1601. Baker noted notable changes in that (1) Rash was "less depressed," (2) Rash reported "'freaking out' yelling, having angry outbursts [and] nightmares about [her boyfriend, Dustin,] leaving her," and (3) indicated that her "last meth use [was] 'months ago.'"[6] Tr. 1598. Rash also discussed her relationships with various family members. Tr. 1600.

---

[4]  Rash reported angry outbursts and, as before, stated that her irritability was "high," and that "most of the time, 'I explode' with yelling [and] throwing things." Tr. 1604.

[5]  Though Rash's reports of auditory and visual hallucinations were consistent, *e.g.*, Tr. 1189, 1465, this appears to be the first description of what the voices said to Rash. Whether what they said was new or this was simply the first time that Martin or Baker listed the information is unclear. Rash's explanation that they "always" said these things suggests the possibility that this was the first time that Martin or Baker decided to include the information.

[6]  Given Rash's previous reports of angry outbursts and of nightmares— for which she was consistently prescribed medication—and her previous reports of methamphetamine use, it is unclear why Baker listed these things as "notable changes."

6

In late July 2020, Rash met by phone with Baker. Tr. 1699–1703. Rash reported making "progress towards [her] goals [and] objectives since last session: [she] sa[id] she fe[lt] better after [her] medications [were] adjusted." Tr. 1699. Among "notable changes," Baker assessed that Rash was "more forthcoming," but that her thought process was "tangential." Tr. 1700.

During the session, Rash discussed her family's cycles of abuse, said—without elaborating—that she feels "triggered by smells, images, and places," and that she nightly has nightmares about her grandfather. Tr. 1702. Rash also reported increased panic attacks when Dustin was "not around." *Id*.

Rash met by phone with nurse Martin on August 6, 2020, and with counselor Baker by phone on August 7, 2020. Tr. 1686–98. During the August 6 meeting, Rash reported that her medications were helping her; she was able to sleep "all night now" and her anxiety and depression were not as severe. Tr. 1692. Although she continued to experience daily mood swings, she experienced fewer episodes of hypomania. *Id*. As on previous occasions, *see* Tr. 1603, Rash reported that during those "intermittent times whe[n] [her] anxiety sho[t] up," her heart would "rac[e]" and she would "feel[] hot" and "'explode' with yelling, throwing things at walls," and "hitting [her] head against [a] wall." *Id*. She continued to report "nightmares almost every night," but said that she copes "when [she] can't sleep [by] rock[ing] back and forth." *Id*. Rash reported visual—dark shadows—and auditory hallucinations involving "deep

7

m[ale] voices that are frightening." *Id*. The voices "always say[] something about 'kill,' and tell her "to hurt others" or occasionally herself." *Id*.

For the first time, Martin assessed Rash as depressed and anxious, but not irritable. Tr. 1693. Baker assessed Rash as having clear speech, a logical thought process, normal cognition and perception, no delusions, partial insight, and a mildly impaired ability to make reasonable decisions. *Id*. Martin also assessed that, as in April 2020, *see* Tr. 1542, Rash was experiencing "auditory[,] command[, and] visual" hallucinations and that her "thought content" involved "preoccupations / ruminations depressive paranoid." Tr. 1693.

The next day during her meeting with Baker, Rash reported that she continued to hear a "deep voice … saying [that] she should kill herself or other people." Tr. 1689. She said that the "voice goes away when she lays in bed and gets loudest during the day." *Id*. Rash also reported seeing "shadows that scare[d] her during the day." *Id*. She continued to "deal[] with stress by rocking." *Id*.

Rash met by phone with Martin in early September 2020. Tr. 1678–85. Aside from Rash's report that her mood swings were "bad lately," and that her anxiety was "high," Martin's report is nearly identical to her report from her August 6, 2020 meeting with Rash, although Martin assessed Rash's mood as "Depressed Anxious Irritable" and her hallucinations as only "Auditory

8

Visual." *Compare* Tr. 1679, *with* Tr. 1692. And the August 6, 2020 report is very similar to the June 2020 report. *Compare* Tr. 1603–04, *with* Tr. 1692.

Rash met by phone with Martin in early October 2020. Tr. 1669–77. With some exceptions, Martin's report is similar to her previous one. *Compare* Tr. 1670, *with* 1679. Despite using medication, Rash reported having "trouble falling asleep [and] staying asleep." Tr. 1670. And her depression was "high." Tr. 1670. Rash continued to experience hallucinations, but Martin now rated them as only "auditory." Tr. 1671.

Rash met in-person with Baker in November 2020. Tr. 1664–68. Baker noted Rash's improved grooming and mental status "notable changes," including a "more stabilized" mood, and a thought process that was "more attentive, logical[,] optimistic[,] and future[-]oriented." Tr. 1665. Baker found Rash to be "very open and willing to discuss her emotions, thoughts, and behaviors during session." Tr. 1667. Rash reported that she had "stopped drinking because [her] daughter asked her … to." Tr. 1667. She "recognize[d] that she … has trouble feeling safe" and reported "nightmares about past sexual abuse occurring nightly over past three days." Tr. 1667–68.

Rash met with Baker again in December 2020. Tr. 1821–25. Rash was nervous about a hearing for her daughter scheduled for the next day. Tr. 1824. Rash reported that her "nightmares cause[d] distress more at sometimes than others." *Id*. Rash described a "resurgence of [certain] episodes" during the previous two weeks. *Id*. She "described" waking up and "feeling as though [a]

perpetrator [was] in the room with her." *Id*. This made her "afraid to sleep and" led to her "stay[ing] up all night." *Id*. Rash would "rock[] to console [her]self." *Id*. She also "described [a] recent 'outburst' that 'just came out'" and resulted in her "covering [her] head, rocking, [and] screaming." *Id*. Rash said that she felt as if "she ha[d] [no] control over the episodes." *Id*. Baker's report implies that these episodes arose because of the approaching Christmas holiday and certain memories Rash associated with the holiday and her childhood. Tr. 1824–25.

*State agency and other medical opinion evidence*[7]

In December 2019, state agency psychologist Karla Delcour, Ph.D., reviewed the medical evidence and determined that Rash was capable of adapting to a structured and predictable work setting with infrequent changes in her responsibilities and expectations, with no exertional limits. Tr. 140. Dr. Delcour opined that:

> Due to the claimant's anxiety and PTSD their ability to deal with supervisors, co-workers, and the public would be reduced, but, they would be able to handle infrequent, superficial contact. The claimant is capable of carrying out simple, routine, repetitive 1-2 step tasks. The claimant can manage and adapt in

---

[7]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

> a structured, predictable work setting, where changes can be explained.

Tr. 140.

In May 2020, upon reconsideration, state agency psychologist Sandra Banks, Ph.D., affirmed Dr. Delcour's findings. Tr. 149.

*Testimonial evidence*

Rash and vocational expert Mary Everts testified during the hearing in December 2020. Tr. 103–30. Rash was represented by attorney Bradley J. Davis. Tr. 103.

Rash testified that she doesn't work because her "anger gets the best of" her, manifesting in "really bad outbursts" that "just come out of nowhere." Tr. 113. In testifying about her symptoms, she stated that she has panic attacks "at least" or "maybe two times a week." Tr. 115. She confirmed that she has nightmares each night. Tr. 117. Rash does not "like to be around a lot of people." Tr. 120. She confirmed that she experienced hallucinations, although she hadn't had one during the previous week. Tr. 122.

Everts testified after Rash. Tr. 125. Everts opined that a hypothetical individual with the same age, education, work experience and limitations as would be able to perform work in the "medium, unskilled category," such as a janitor, kitchen helper, or laundry worker. Tr. 127. But if the individual could only "interact on an occasional basis with supervisors[]" and "otherwise … work in isolation, … there would be no jobs." Tr. 127–28.

## The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since September 26, 2019, the application date (20 CFR 416.971 et seq.).

2.  The claimant has the following severe impairments: depression; anxiety disorder; delusional disorder; and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine and repetitive tasks, but cannot perform tasks which require a high production rate pace such as assembly line work, can make only simple work-related decisions, and should not be responsible for the safety or welfare of others. She can interact on an occasional basis with supervisors and a small group of familiar co-workers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution and confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others. The claimant can respond appropriately to occasional change in a routine work setting, as long as such changes are easily explained and/or demonstrated in advance of gradual implementation.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on May 15, 1992 and was 27 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 26, 2019, the date the application was filed (20 CFR 416.920(g)).

Tr. 89–96.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

Rash argues that "[t]he ALJ's finding that [she] retained a residual functional capacity for unskilled, low-stress work was not supported by substantial evidence." Doc. 7, at 9. Specifically, she alleges that "the ALJ's analysis of the evidence of [her] mental impairment did not identify those dates of treatment which would support disability and, instead, cited favorably to those dates of treatment which would show stability." *Id*. at 11. In support of this assertion, Rash cites the ALJ's discussion—in one specific part of his decision—of four of Rash's appointments with Martin and Baker at Phoenix Rising and his alleged omission of six others. *Id*. at 11. Some context will help frame this issue.

A residual functional capacity, often referred to as an "RFC," is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945); *see* Social Security Ruling 96-8p, https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). Basically, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir.

2004) (quoting *Howard*, 276 F.3d at 239). The RFC assessment could be called

step 3.5 in the five-step sequential analysis, because an ALJ will use the RFC

at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step

three to step four, we assess your residual functional capacity.... We use this

residual functional capacity assessment at both step four and step five when

we evaluate your claim at these steps."), (e).

As noted in the factual background, above, the ALJ formulated Rash's

RFC.[8] Tr. 92. He then explained how he arrived at his determination. He first

explained that he had "considered the medical opinion(s) and prior

administrative medical finding(s)," as required by regulation, and followed the

two-step process for evaluating Rash's symptoms. *Id*. In part, the ALJ

---

[8]     For ease of reference, the ALJ determined that Rash:

> ha[d] the residual functional capacity to perform a full range of
> work at all exertional levels but with the following nonexertional
> limitations: The claimant can perform simple, routine and
> repetitive tasks, but cannot perform tasks which require a high
> production rate pace such as assembly line work, can make only
> simple work-related decisions, and should not be responsible for
> the safety or welfare of others. She can interact on an occasional
> basis with supervisors and a small group of familiar co-workers,
> with no more than incidental interaction with the general public,
> and should be limited to superficial contact meaning no sales,
> arbitration, negotiation, conflict resolution and confrontation, no
> group, tandem or collaborative tasks, and no management,
> direction or persuasion of others. The claimant can respond
> appropriately to occasional change in a routine work setting, as
> long as such changes are easily explained and/or demonstrated in
> advance of gradual implementation.

Tr. 92.

explained, this evaluation entailed deciding whether Rash's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" were "consistent with the medical … and other evidence in the record." Tr. 92–93. In deciding that they weren't, the ALJ reviewed the evidence of Rash's appointments with Baker and Martin, specifically mentioning her appointments in September and December 2019, and April, June, and November 2020. Tr. 93–94.

The ALJ then turned to the state agency psychological evaluations prepared by Dr. Delcour and Dr. Banks, which he found "persuasive with some adjustments in [Rash's] favor." Tr. 94. The ALJ stated the limitations he'd recited "were additionally well supported [by] the record available for review and at the hearing level." Tr. 94. Notably, this record included evidence that the ALJ reviewed in a section of his decision immediately before the section on which Rash focuses. *See* Tr. 91.

Finally, the ALJ reviewed two state agency physical consultant evaluations. Tr. 94–95. Of these, one was persuasive. Tr. 95. That evaluation contained the opinion that Rash "did not have a severe physical impairment that impeded her ability to perform most work-related tasks." *Id*.

This brings us back to Rash's complaint, which focuses only on her "mental impairments" and the ALJ's review, in the context of the ALJ's formulation of Rash's RFC, of the reports prepared by Baker and Martin. Doc. 7, at 1. Rash says nothing about the ALJ's findings regarding the state agency

evaluations on which he relied. She also ignores the ALJ's review of Baker's and Martin's reports in his step-three analysis. Rash asserts that the ALJ "cherry pick[ed]" "those dates of treatment" with Phoenix Rising "which would show stability" rather than disability. Doc. 7, at 10–12. As it turns out, Rash is wrong on both the law and the facts.

It's true that an ALJ may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See Gentry v. Comm'r*, 741 F.3d 708, 723–24 (6th Cir. 2014). But the fact that an ALJ fails to mention certain evidence in one section of his decision doesn't mean that he was cherry-picking evidence. Afterall, ALJs aren't "require[d] … to discuss every piece of evidence in the record." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023); *see Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Indeed, "with a nearly [two]-thousand-page record, the ALJ cannot be expected to discuss every piece of evidence that [Rash] believes is inconsistent with the RFC." *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted sub nom. Byler v. Comm'r of Soc. Sec. Admin.*, No. 5:20-cv-1822, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

Further, an ALJ is also not required to reanalyze evidence at each step of his analysis. So if the ALJ reviews relevant evidence in an earlier step of the five-step sequential analysis, he need not recap his review of that evidence during his discussion relevant to a later step. *See Crum v. Comm'r of Soc. Sec.*,

19

660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Remembering that courts do not re-weigh the evidence, it is thus unsurprising that some courts have noted that cherry-picking-evidence arguments are "seldom successful." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh record evidence. It is no more availing on appeal.").

According to Rash, the ALJ in his RFC discussion unfairly omitted consideration of reports about her appointments in 2020 on July 31, August 6 and 7, September 1, October 6, and December 17. Doc. 7, at 11. Rash argues that "[t]he ALJ's analysis unfairly skewed the reality of Plaintiff's limitations." *Id.* at 12.

But Rash ignores the fact that *right before* assessing her RFC, the ALJ discussed her medical evidence and specifically reviewed two of the reports she says that he failed to discuss. *See* Tr. 91. In doing so, he mentioned much of the information that she says the ALJ omitted. *Compare* Tr. 91, *with* Doc. 7, at 11. And the ALJ wasn't required to repeat his earlier review during his RFC discussion. *See Crum*, 660 F. App'x at 457.

Additionally, Rash's complaint runs headlong into the fact that ALJs aren't "require[d] … to discuss every piece of evidence in the record." *Showalter*, 2023 WL 2523304, at *3. As detailed in the factual discussion, there simply was no great variation in the reports submitted by Baker and Martin. In many cases, the narratives are largely reproduced verbatim. So it was reasonable for the ALJ to select a representative sample when evaluating Rash's symptoms. *See Byler*, 2022 WL 980099, at *9 (noting that an "ALJ did not ignore the kinds of evidence Plaintiff identified").

Moreover, considering each report that Rash *claims*[9] the ALJ omitted, it's apparent that *cherry-picking* is a description that more aptly applies to Rash's argument than the ALJ's analysis. Rash points to her July 31, 2020 report, which she said referenced "tangential thought process, ongoing nightmares and trauma triggers, increased panic attacks when Plaintiff's boyfriend was not around." Doc. 7, at 11; *see* Tr. 1700-03. But this sort of information was conveyed in other reports that the ALJ referenced. *See* Tr. 1542 (April 2020, showing racing thoughts), 1667–68[10] (noting that Rash "described feeling unsafe without Dustin," "recognizes that she experienced

---

[9]     As is discussed, Rash is mistaken that the ALJ omitted mention of Rash' October 6 and December 17, 2020 appointments.

[10]     Pages 1667 and 1668 are part of exhibit 19F, which concerns Rash's November 2020 visit with Baker, and which the ALJ reviewed repeatedly as part of his step-three analysis. Tr. 91.

many violent threats and has trouble feeling safe," and had "nightmares about past sexual abuse").

According to Rash, the August 6, 2020 report revealed "improvement in some symptoms since medication change, but [also showed] ongoing auditory and visual hallucinations, commanding [her] to hurt or kill herself and others, depressive and paranoid preoccupations and delusions on mental status exam." Tr. 1692–93. In fact, this report detailed several improvements. Rash reported that her medications were helping her; she was able to sleep "all night now" and her anxiety and depression were not as severe. Tr. 1692. And while she continued to experience daily mood swings, she experienced fewer episodes of hypomania. *Id.* Moreover, as Rash's use of the adjective *ongoing* suggests, Doc. 7, at 11, the other information she references was of a continuing nature and not significantly different from previous reports. *Compare* Tr. 1542 (April 2020) (referencing "preoccupations / ruminations depressive paranoid"), 1620 (June 2020) (discussing hallucinations), *with* Tr. 1692. Indeed, the ALJ quoted a later report during his step-three analysis for the point that "[t]here were noted preoccupations/ruminations, which were noted to be depressive and paranoid." Tr. 91 (citing exhibit 19F, at 10, found at Tr. 1671). Contrary to Rash's claims therefore, specific reference to the August 6 report could not have affected the outcome. If anything, it's omission from the ALJ's analysis could only have helped Rash.

Rash next faults the ALJ for omitting mention of the report concerning her August 7, 2020 visit with Baker. Doc. 7, at 11. She says that report included "further description of hallucinations, being loudest during the day and using rocking to deal with her stress." Tr. 1689. But the ALJ discussed Rash's hallucinations and her use of rocking as a coping mechanism. Tr. 91, 93. Rash provides no explanation for why the ALJ would need to discuss this specific report's discussion of information that he'd already referenced and that was found in another report he'd already discussed. *See* Tr. 94, 1604.[11] And she doesn't explain why it would have been significant that her auditory hallucinations were loudest during the day.

Rash's complaint about the omission of Martin's September 1, 2020 report is similarly unpersuasive. She says that report reveals the "ineffectiveness of medication adjustments, [and] ongoing hallucinations and depressive preoccupations and ruminations." Doc. 7, at 11 (citing Tr. 1679, 1680, 1685). As noted in the factual discussion, however, aside from detailing that Rash's mood swings were "bad lately" and that her anxiety was "high," Martin's report is nearly identical to her report from her August 6, 2020 meeting with Rash.[12] *Compare* Tr. 1679, *with* Tr. 1692. And the August 6, 2020

---

[11]    Page 1604 concerns a June 2020 report found in exhibit 16F. The ALJ mentioned the June 2020 report but failed to include a citation. *See* Tr. 94. Nonetheless, he referenced the month of the report and referenced information in it—methamphetamine use. *Id.*; *see* Tr. 1603.

[12]    One the one hand, the September report said that Martin assessed Rash's mood as "Depressed Anxious Irritable," rather than merely "depressed

report is very similar to the June 2020 report, which the ALJ discussed. *Compare* Tr. 1603–04, *with* Tr. 1692. Further, the April 2020 report and a later report, both of which the ALJ paraphrased, included the notations "Thought content: Preoccupations / ruminations Depressive Paranoid." Tr. 91, 93–94, 1542, 1671.

This leaves allegedly omitted reports from October 6, 2020, and December 17, 2020. But the ALJ discussed both of these reports. The October 6 report is pages 8 to 16 of record exhibit 19F. *See* Tr. 1669–77. The December 17, 2020 report is record exhibit 21F. *See* Tr. 1821–25. The ALJ's decision reflects his discussion of both reports as part of his step-three analysis. Tr. 91. Because the ALJ wasn't required to reproduce his step-three analysis—during which he discussed many of the things Rash references as being omitted—in his RFC analysis, *see Crum*, 660 F. App'x at 457, Rash's argument about these reports fails.

Even ignoring the above, however, and assuming that the first four reports to which Rash points were somehow materially different from those that the ALJ specifically considered, Rash does nothing to show that specific review of those four would have changed anything. And she doesn't challenge the ALJ's determination that the state agency psychological evaluations, and

---

anxious." *Compare* Tr. 1680, *with* Tr. 1693. On the other, however, the September report said her hallucinations were only "Auditory Visual," Tr. 1680, as compared to the August 6 report, which said they were "Auditory Command Visual." Tr. 1693.

one of the State agency physical consultant evaluations, were persuasive. *See* Tr. 94–95. Instead, she merely asserts without any analysis that specific review of the first four reports would have changed the outcome. Merely asserting a conclusion, however, is not enough to show that it is so, *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 426 (D.C. Cir. 2000) ("merely saying it does not make it so"), particularly since "[t]here is ample case law" that the state agency evaluations that Rash ignores "may constitute substantial evidence supporting an ALJ's decision," *Byler*, 2022 WL 980099, at *8 (citing cases).

Finally, Rash argues that "[t]he ALJ's analysis unfairly skewed the reality of Plaintiff's limitations." Doc. 7, at 12. She adds and that absent that "skew[ing,]" the ALJ would have found her disabled "based on the vocational expert's testimony regarding time off-task and absenteeism, if not … based on marked limitations in Plaintiff's abilities to concentrate, persist or maintain pace, and to adapt or manage herself." *Id*. Rash notably does not otherwise mention in her argument the vocational expert's testimony or Rash's abilities to concentrate, persist or maintain pace, or to adapt or manage herself.[13] So this must amount to an effort to show that the ALJ's alleged error was not

---

[13]     Rash has forfeited any assertion of error based on (1) the vocational expert's testimony regarding time off-task and absenteeism, or (2) Rash's abilities to concentrate, persist or maintain pace, and to adapt or manage herself. *Buetenmiller v. Macomb Cty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (holding that the Court "consider[s] … forfeited" "'[i]ssues [that are] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation'") (citation omitted).

harmless. But because the ALJ did not err, there is no reason to conduct a harmless error analysis.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 28, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)